**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WAYNE WILLIAM WRIGHT,
*Plaintiff-Appellant,*

v.

CHARLES L. BECK; MICHAEL NELSON
FEUER; HEATHER AUBRY; RICHARD
TOMPKINS; JAMES EDWARDS; CITY
OF LOS ANGELES,
*Defendants-Appellees.*

No. 19-55084

D.C. No.
2:15-cv-05805-
R-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted April 1, 2020
Pasadena, California

Filed December 1, 2020

Before:  Richard A. Paez, Consuelo M. Callahan, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Paez

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in an action brought pursuant to 42 U.S.C. § 1983 alleging, in part, that law enforcement officials violated plaintiff's Fourteenth Amendment due process rights when they seized and destroyed a portion of his firearms collection.

Officers of the Los Angeles Police Department ("LAPD") executed a search warrant and seized plaintiff's collection of over 400 firearms. Plaintiff spent the next decade trying to recover the collection, asserting he owned the firearms lawfully. The LAPD voluntarily returned approximately eighty firearms, but kept the rest because, in its determination, plaintiff had not submitted sufficient proof that he owned them. While the parties were still negotiating, LAPD officer Edwards applied to the Los Angeles County Superior Court for an order granting permission to destroy the firearms, without giving plaintiff notice that he intended to seek such an order. Having obtained the order, the LAPD destroyed the firearms by smelting them.

The panel held that plaintiff did not argue he was entitled to notice beyond what due process mandated, as defendants asserted. Had plaintiff abandoned the firearms and the requisite time had lapsed under California Penal Code section 34000(a), perhaps the LAPD could have applied ex parte for a destruction order without giving notice of its

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

intended action.  But given that plaintiff continued to assert a claim of right to the firearms and reasonably believed that the LAPD was still reviewing the documentation he provided, he was entitled to know that the LAPD intended to seek an order permitting destruction of the remaining firearms.

The panel held that a reasonable factfinder could conclude that officer Edwards violated plaintiff's due process rights.  The panel had no doubt that officer Edwards had fair notice that his conduct violated plaintiff's due process right to notice, and therefore he was not entitled to qualified immunity.   The panel rejected defendants' arguments that the district court's judgment should be affirmed on alternative grounds, including assertions that defendants were entitled to derivative quasi-judicial immunity, that plaintiff released his property interest in the collection, and that a state order precluded the determination that plaintiff was entitled to notice.  The panel affirmed, however, the district court's conclusion that LAPD officers Aubry and Tompkins were entitled to summary judgment because there was no evidence linking them to the alleged due process violation.

Because the panel reversed the district court's grant of summary judgment on plaintiff's Fourteenth Amendment due process claim, the panel also reversed the district court's grant of summary judgment on plaintiff's failure-to-train claim brought under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), which the district court characterized as derivative of plaintiff's due process and Fourth Amendment claims.

In a separate memorandum disposition, the panel affirmed the district court's grant of summary judgment on

a defense of qualified immunity on plaintiff's Fourth
Amendment claim.

---

## COUNSEL

Anna M. Barvir (argued), C. D. Michel, Joshua R. Dale, and
Scott M. Franklin, Michel & Associates P.C., Long Beach,
California, for Plaintiff-Appellant.

Matthew A. Scherb (argued), Deputy City Attorney; Blithe
S. Bock, Managing Assistant City Attorney; Scott Marcus,
Chief, Civil Litigation Branch; Kathleen A. Kenealy, Chief
Assistant City Attorney; Michael N. Feuer, City Attorney;
Office of the City Attorney, Los Angeles, California; for
Defendants-Appellees.

---

## OPINION

PAEZ, Circuit Judge:

Wayne Wright spent decades amassing a collection of
over 400 firearms, which, according to him, was worth over
half a million dollars. In 2004, officers of the Los Angeles
Police Department (LAPD) executed a search warrant and
seized the collection. Wright spent the next decade trying to
recover it, asserting he owned the firearms lawfully. The
LAPD voluntarily returned approximately eighty firearms,
but kept the rest because, in its determination, Wright had
not submitted sufficient proof that he owned them.

While the parties were still negotiating, an LAPD officer
applied to the Los Angeles County Superior Court for an
order granting permission to destroy the firearms. The

officer did not give Wright notice that he intended to seek such an order.  Thus, Wright did not have an opportunity to contest the officer's application, and the court granted it. Having obtained the order, the LAPD destroyed the firearms by smelting them.   Wright sued various parties under 42 U.S.C. § 1983, asserting, among other claims, a violation of his Fourteenth Amendment right to due process.   The district court granted summary judgment in favor of the defendants sued in their individual capacities.   Because Wright could not prevail against the individual defendants, the court also concluded that Wright could not maintain his *Monell* failure-to-train claim[1] against the municipal defendants and granted summary judgement in favor of those defendants as well.

We consider whether, on the facts alleged by Wright, his due process rights were violated and, if so, whether the law was clearly established at the time of the violation.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.[2]

## I.

The saga begins after an LAPD sting operation in 2004.[3] The LAPD obtained a search warrant from the Los Angeles County Superior Court (the "Los Angeles Court") and seized

---

[1] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

[2] In a separate memorandum disposition, we affirm the district court's grant of summary judgment on a defense of qualified immunity on Wright's Fourth Amendment claim.

[3] We review the facts, as we must, in the light most favorable to Wright.  *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016).

more than 400 firearms from Wright's residence and storage unit in Ventura County.  In August 2006, Wright pled guilty to one count of possession of an unregistered assault weapon.  The plea agreement, reduced to a court order imposing probation conditions, stated that Wright could not possess any firearms for thirty-six months.  Under the terms of the agreement, the firearms would be destroyed or sold unless Wright could provide proof of ownership to the LAPD as required by its policy regarding the return of seized guns.  LAPD policy provided:

> The Department must accept any reasonable proof of ownership. Registration in the name of the lawful owner shall constitute proof of ownership.  However, a lack of registration does not constitute a lack of proof of ownership unless registration is required by law for possession and/or ownership of the gun. Unless there is articulable probable cause to disbelieve a sworn declaration from the claimant/owner, a sales receipt, or other proof of ownership from the claimant shall constitute proof of ownership.

Manual of the LAPD, Vol. IV, at § 560.40[4].  In other words, under departmental policy, Wright could prove he owned the firearms by either showing they were registered in his name *or* through a sworn declaration, sales receipt, or other proof of ownership, unless the LAPD had probable cause to disbelieve such evidence.

---

[4] Available at https://www.lapdonline.org/lapd_manual/volume_4.htm#540.

A few months after pleading guilty, Wright moved the Ventura County Superior Court (the "Ventura Court") for return of his seized property. The LAPD agreed to release twenty-eight firearms registered to Wright but opposed release of the remaining firearms. The court ordered release of the non-firearm property in a written order. The order, however, did not identify the twenty-eight firearms the LAPD conceded belonged to Wright, nor did it address the remaining firearms of which Wright sought release. According to Wright, the court delayed ruling on those matters to another day and, for unspecified reasons, removed the rescheduled hearing from its calendar.[5] The record, however, does not indicate a further hearing was ever set.

After completing his term of probation, Wright and his then-counsel Joseph Silvoso ("Silvoso") spent the next seven years negotiating off and on with LAPD Detectives Richard Tompkins ("Tompkins") and James Edwards ("Edwards") and Deputy City Attorney Heather Aubry ("Aubry") about the kinds of records that Wright would need to furnish to obtain his firearms. In May 2010, Silvoso provided the LAPD with receipts for ninety-four firearms and explained the difficulty in obtaining records for the others because Wright had spent decades acquiring them. A few months later, the LAPD explained that it was "slowly" reviewing the records Wright provided but, for unexplained reasons, stated it required original receipts rather than the copies Wright provided. Silvoso explained he could not hand over the original receipts but invited Edwards and

---

[5] Wright represents that the court continued the hearing to decide the remaining claims and later removed the hearing from calendar but does not cite a written ruling or minute order to that effect. The LAPD reiterated the same procedural history in its opposition to Wright's 2011 motion for a return of his property.

Aubry to inspect them in his office.  In November 2010, Silvoso followed up with Edwards and Aubry asking if they needed anything beyond the original receipts and a sworn declaration to prove ownership of the firearms.  Edwards and Aubry did not respond.

About a year later, in August 2011, Wright filed another motion in the Ventura Court for return of his firearms.  In its opposition, the LAPD reiterated that it did not oppose releasing twenty-six firearms, all of which reflected a "Dealer Record of Sale" to Wright, but opposed releasing the remaining firearms.[6]  The LAPD also moved the Ventura Court for an order to destroy the remaining firearms.  In reply, Wright filed a declaration asserting he owned all the seized firearms (save for forty) and attached the ninety-four receipts he previously had provided to the LAPD.

The court held a hearing the following month, in September 2011.  At the hearing, the LAPD admitted it had delayed reviewing Wright's records and had not yet reviewed the receipts or Wright's sworn declaration.  The department explained it needed additional time to review the records to determine whether Wright had provided reasonable proof of ownership.  As a result of the LAPD's representation, the court, in a written order dated October 17, 2011, ordered the LAPD to release the twenty-six firearms it had agreed belonged to Wright.[7]  The court did not rule on the remaining disputed firearms.  Instead, the court instructed the parties to meet and confer to determine

---

[6] It is unclear why the LAPD's initial decision to release twenty-eight firearms in 2007 dropped to twenty-six in 2011.

[7] The summary judgment record does not contain a copy of the court reporter's transcript of this hearing.

whether the ownership status of the remaining firearms could be resolved informally and, if not, to return to court.[8]

Immediately after the hearing, Wright and Silvoso spoke with Aubry and Tompkins in the courthouse hallway. During that conversation, Aubry and Tompkins stated they would contact them if the LAPD believed they needed additional proof of ownership. In November 2011, Wright provided the original versions of the ninety-four receipts to the LAPD. Later that month, Tompkins emailed Silvoso stating that the LAPD was "still working [their] way through the receipts." A few months later, in March 2012, Tompkins reassured Silvoso that the LAPD was "making progress" with Wright's case and would contact Silvoso within a few weeks. The parties continued to negotiate over email.

In April 2012, Edwards and Tompkins determined Wright had proved that he owned eighty of the ninety-four firearms for which he provided receipts, which included the original twenty-six that the LAPD already had released, as provided by the Ventura Court's order. The order permitting release of the twenty-six firearms did not reference or grant a request to destroy the remaining 300-plus firearms[9] in the LAPD's custody. Nor did the officers tell Wright that they

---

[8] Defendants contend that the court's October 2011 order constituted a "deni[al]" of Wright's request for return of all his firearms and stress that Wright never "[sought] review" of this order. But, contrary to Defendants' argument, the Ventura Court did *not* decide the fate of the remaining guns, and, as this court later recognized, left "the final resolution" of those guns "for another day." *Wright v. Beck*, 723 Fed. App'x 391, 392 (9th Cir. Dec. 20, 2017).

[9] This number is estimated by subtracting from the original 463 seized firearms the eighty firearms the LAPD conceded belonged to Wright and the forty firearms over which Wright did not declare ownership.

had completed their review process or had probable cause to
disbelieve his sworn declaration as to the remaining
firearms. In fact, no one informed Wright or Silvoso the
review process had been completed, or that it was
determined Wright did not prove he owned the remaining
firearms. Wright assumed that Tompkins and Edwards were
reviewing his records to determine whether he needed to
provide additional proof. He assumed so because of their
consistent representations that they were still reviewing the
records. He also understood the court's statements at the
September 2011 hearing required the parties to return to
court once informal negotiations had failed.

Instead, in December 2013, Edwards applied ex parte to
the Los Angeles Court—to the same judge who had
approved the 2004 search warrant—for an order permitting
destruction of the remaining firearms. In the request for
destruction, Edwards represented to the court:

> The evidence was seized in 2004. Items that
> have been identified as belonging to the
> [defendant] though [*sic*] receipts, DROS and
> Etrace have been returned. No evidence of
> ownership by the [defendant] has been
> received in regard to the last remaining items
> of evidence. The time to appeal has long
> since passed.

Wright presents no evidence suggesting that Aubry knew
about or instructed Edwards to seek the court order without
providing Wright or his counsel notice. Similarly, Wright
presents no evidence that Tompkins facilitated Edwards's
efforts in seeking the court order. Nonetheless, it is
undisputed that neither Edwards, Tompkins, nor Aubry gave
notice to Wright or his counsel. Ultimately, the court

granted the application and issued the order. Accordingly, in June 2014, the LAPD destroyed the remaining 300-plus firearms, over which Wright continued to assert ownership. In August 2014, Wright's counsel learned that the LAPD had destroyed the firearms.

The following year, Wright sued Aubry, Edwards, and Tompkins, Los Angeles Police Department Chief Charles L. Beck ("Beck"), Los Angeles City Attorney Michael N. Feuer ("Feuer"), and the City of Los Angeles (the "City") (collectively, "Defendants") in federal court. Wright's First Amended Complaint, the operative complaint, alleged, among other claims: (1) violations of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 against all defendants and sought damages against only Aubry, Edwards, and Tompkins; and (2) a *Monell* claim against Beck, Feuer, and the City for failure to train. Wright sued Aubry, Edwards, and Tompkins in their individual capacities and Beck and Feuer solely in their official capacities. Defendants moved to dismiss, arguing that the Ventura Court impliedly ruled in its September 2011 order that Wright had no possessory interest in the firearms. The district court granted the motion, and Wright appealed. We reversed, holding in a memorandum disposition that the court "grossly mischaracterized" the Ventura Court order to suggest that Wright had no possessory interest in the firearms. *Wright*, 723 Fed. App'x at 392. We reasoned that the Ventura Court left "the final resolution" of those guns "for another day." *Id.*

On remand, and after discovery had closed, Defendants moved for summary judgment on the merits of Wright's Fourth and Fourteenth Amendment claims. Defendants Aubry, Tompkins, and Edwards also raised a qualified immunity defense. The district court granted the motion,

concluding the individual named Defendants, even those sued in their official capacity, were entitled to qualified immunity.[10]   The court reasoned that Tompkins and Edwards were entitled to qualified immunity because they acted in accordance with California law, LAPD policy, and court orders.  The court also reasoned that Beck, Aubry, and Feuer were entitled to qualified immunity because there was no evidence they promulgated or enforced any illegal policies.

Further, the district court held that Wright's due process rights were not violated because he was not entitled to notice that the LAPD sought a disposition order from the Los Angeles Court to destroy the firearms.  The district court also held no Fourth Amendment violation occurred because the officers acted reasonably in refusing to return the seized firearms that had not been released by court order.  Last, because the district court granted summary judgment in favor of Defendants on Wright's Fourth and Fourteenth Amendment claims, it concluded that Wright's *Monell* claim also failed as a matter of law.

Wright timely appealed.

## II.

We review de novo grants of summary judgment. *Mendiola-Martinez*, 836 F.3d at 1247.  In so doing, we "must determine whether, viewing the facts in the light most favorable to . . . the non-moving party, any genuine issues of

---

[10] The court did not specify for which alleged constitutional violation they were entitled to qualified immunity.

material fact exist, and whether the district court correctly applied the substantive law." *Id.*

Qualified immunity shields government officials from civil liability if "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The protection "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). The reasonableness of the officer's conduct is "judged against the backdrop of the law at the time of the conduct." *Id.* (quotation marks and citation omitted).

"In determining whether an officer is entitled to qualified immunity, we employ a two-step test . . . ." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). First, "we decide whether the officer violated a plaintiff's constitutional right . . . ." *Id.* "[I]f the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question. *Id.* (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)). In the second step, "we ask whether [the constitutional right's] contours were sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 442 (quotation marks omitted). "While we do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quotation marks, citation, and alteration omitted). "The Supreme Court has made 'clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id.*

(quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013).

## A.

The Fourteenth Amendment guarantees that a state cannot "deprive any person of . . . property[] without due process of law." U.S. Const., Amend. XIV.[11]  Despite the somewhat Delphic formulation, one of due process's central and undisputed guarantees is that, before the government permanently deprives a person of a property interest, that person will receive—at a minimum—notice. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950); *see also Tulsa Pro. Collection Servs. v. Pope*, 485 U.S. 478 (1988); *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993).

Notice is so critical because it enables the opportunity to be heard. *Mullane*, 339 U.S. at 314; *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'").  A meaningful opportunity to be heard, in turn, provides its own benefits.  It helps "minimize substantively unfair or mistaken deprivations." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  It also preserves the "high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference." *Id.*  And it preserves a person's dignity to "choose for himself whether to appear or default,

---

[11] Defendants do not dispute that Wright's firearms fall under the category of "property" governed by due process.

acquiesce or contest." *Mullane*, 339 U.S. at 314. Without notice, "[the] right to be heard has little reality or worth." *Id.*[12]

Thus, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314; *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999) (holding the form of notice must be sufficient to ensure the opportunity to be heard is "meaningful.").

In the time since *Mullane* was issued, the Supreme Court has "adhered unwaveringly" to its pronouncements, frequently holding that inadequate attempts to provide notice violate due process. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 797 (1983) (citing cases). For instance, in *Walker v. City of Hutchinson*, 352 U.S. 112, 116 (1956), the Court held notice of a condemnation proceeding in a local newspaper was insufficient to provide a landowner with notice. The Court reasoned, given the fundamental importance of notice, and the risk that newspaper publication alone would fail to ensure it, due process was violated. *Id.* Similarly, in *Greene v. Lindsey*, 456 U.S. 444, 453 (1982), the Court held that posting notice on the door of a tenant's apartment of a forcible entry or detainer action "does not satisfy minimum standards of due process." Due process demanded more, the Court explained, given that additional

---

[12] Although Wright also argues that a due process violation also occurred under the balancing test under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the *Mullane* test "supplies the appropriate analytical framework," as the pending issue involves "the adequacy of the method used to give notice," *Dusenberry*, 534 U.S. at 167–68.

efforts, such as notice by mail or additional home visits, were feasible.  *Id.* at 454–55.

By logical extension, outright failures to even attempt to provide notice violate due process.  For example, in *Sniadick v. Family Finance Corp.*, the Supreme Court struck down a state statute that allowed a worker's wages to be frozen, without notice or an opportunity to be heard, in between garnishment and resolution of a lawsuit.  395 U.S. 337, 338–42 (1969).  The Court concluded: "Where the taking of one's property is so obvious, it needs no extended argument that absent notice and a prior hearing this prejudgment garnishment procedure violates the fundamental principles of due process."  *Id.* at 342 (citation omitted)*; see also Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 84 (1988) ("Failure to give notice violates 'the most rudimentary demands of due process of law.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965)); *Perkins*, 525 U.S. at 240–41.

Due process is not satisfied simply because judges have facilitated the deprivation.  For instance, in *Fuentes*, the Court struck down state statutes authorizing the summary seizure of goods under an ex parte writ of replevin, without notice or an opportunity to be heard.  407 U.S. at 96–97.  The Court explained: "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented."  *Id.* at 81.  The Court reached this conclusion even though the putative owner of the goods eventually received notice and could contest the deprivation through post-deprivation procedures.  *Id.*  And it made no difference a judge oversaw the process and granted the writ of replevin.  *See id.*

Similarly, in *Peralta*, the Supreme Court reversed a default judgment that was "entered without notice or

service" as "constitutionally infirm." 485 U.S. at 84. The Court held that reversal was required, even without a showing of prejudice, and rejected the lower court's threshold inquiry into the defenses the party would have brought or the litigation strategy they would have adopted. *Id.* at 86–87 ("[I]t is no answer to say . . . due process of law would have led to the same result because [a defendant] had no adequate defense upon the merits.") (quoting *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 424 (1915)). That is because notice—regardless of what it might have accomplished in a particular case—is such a core aspect of due process that its absence will lead us to question the fairness of the deprivation.

Further, even in cases after the government has lawfully seized property, reasonable notice must be provided prior to a final deprivation. *See Perkins*, 525 U.S. at 240–41 ("[W]hen law enforcement agents seize property pursuant to warrant, due process requires them to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return."). That is why, in *Matthias v. Bingley*, the Fifth Circuit held that a municipal ordinance that authorized, without notice to the property owners, the disposal of property seized pursuant to a criminal investigation violated due process. 906 F.2d 1047, 1053 (5th Cir. 1990). The court reasoned that the ordinance created a "high risk of erroneous deprivations." *Id.* at 1052.

Similarly, in *Gates v. City of Chicago*, the Seventh Circuit reversed a summary judgment ruling in favor of a municipality on a § 1983 action because a triable issue of fact existed about whether the notice form provided to arrestees satisfied due process. 623 F.3d 389, 401 (7th Cir. 2010). The court concluded that the procedures to retrieve property were "arcane and not generally available," and thus

18                    WRIGHT V. BECK

individual notice was required under *Memphis Light*.   *Id.* at 400.

Unsurprisingly, for decades, California courts have also heeded the straightforward rule of requiring notice, both as due process principle and as a procedural rule.   *Menefee & Son v. Dep't of Food & Agric.*, 245 Cal. Rptr. 166, 170 (Ct. App. 1988) ("[A]t a minimum, due process requires notice and an opportunity for a hearing."); *Conservatorship of Moore*, 229 Cal. Rptr. 875, 879 (Ct. App. 1986) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action . . . .") (quoting *Mullane*, 339 U.S. at 314); *People v. Wilshire Ins. Co.*, 119 Cal. Rptr. 917, 920 (Ct. App. 1975) ("[I]n an adversary proceeding where an order may affect the rights of an adverse party, notice must be given to protect the adverse party's right to be heard on the issue as a matter of due process of law."); *McDonald v. Severy*, 59 P.2d 98, 99 (Cal. 1936) ("The general rule is that notice of motion must be given whenever the order sought may affect the rights of an adverse party."); *In re Sara D.*, 104 Cal. Rptr. 2d 909, 916 (2001) ("[A]bsent extraordinary circumstances, even ex parte applications require notice to all parties of the application the day before the ex parte hearing.") (citing Cal. Rules of Court 379).

Thus, like federal courts, when a party fails to give adequate notice to an adverse party of a court proceeding, California courts have not hesitated, in various contexts, to declare a due process violation and nullify the underlying order or judgment.   *See, e.g.*, *Jones v. Otero*, 203 Cal. Rptr. 90, 92 (Ct. App. 1984) (reversing sanctions order because "no notice whatsoever was given" in violation of

"fundamental principles of due process"); *O'Brien v. Cseh*, 196 Cal. Rptr. 409, 412 (Ct. App. 1983) ("Plaintiff's rush to compel sanctions against defendant on an ex parte basis [without notice] was a flagrant violation of due process principles."). Statutory schemes that authorize the destruction of property without notice similarly have been held to be unconstitutional. *See Menefee & Son*, 245 Cal. Rptr. at 171.

In contrast, when "timely and adequate notice" of a hearing implicating a person's rights was given, courts have declined to find a due process violation. *See, e.g., Needelman v. DeWolf Realty Co.*, 191 Cal. Rptr. 3d 673, 685 (Ct. App. 2015), *as modified on denial of reh'g* (Aug. 18, 2015) (holding ex parte motion in eviction proceeding did not deprive individual of due process because he received adequate notice of the application prior to the hearing) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)).

To be sure, due process tolerates some variance on *when* to provide notice, "appropriate to the nature of the case." *Mullane*, 339 U.S. at 313. For instance, in "rare and extraordinary situations," the government may deprive an individual of property without notice or an opportunity to be heard, so long as the person is later notified of the deprivation and the procedures to contest it. *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972). One such example occurred in *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 315 (1908), wherein the Supreme Court upheld a municipal ordinance that authorized the summary seizure and destruction of food deemed unfit for human consumption. The Court explained that the need for immediate action outweighed the risk of erroneous deprivation, and, if such error occurred, the owner could

recover damages after the incident in an action at law.  *Id.*
at 315–16.[13]

Further, the Supreme Court has limited the *amount of
effort* a party must exert to provide actual notice to a party
whose rights are implicated.  *See Dusenbery*, 534 U.S.
at 168–72.  In *Dusenbery*, for example, the Court considered
whether the government's attempt at serving notice to an
individual of its intention to forfeit property seized at the
time of his arrest satisfied due process's notice requirements.
The government sent letters by certified mail to the
correctional institution in which he had been incarcerated,
the residence where he had been arrested, and to his mother's
home; and it published legal notice of the forfeiture for three
consecutive weeks in a local newspaper.  *Id.* at 164.  The
individual sued, claiming he was entitled to "actual notice"
under *Mullane*.  *Id.* at 169–73.  The Court disagreed, holding
that due process does not require "actual notice," but rather
only reasonable efforts to achieve it, and held the
government's efforts were reasonable.  *Id.* at 169–71.

Additionally, the Supreme Court has limited the *content*
a notice form must contain to satisfy due process.  For
instance, in *Perkins*, the Court held that the government need
not "give detailed and specific instructions or advice to
owners" on how they can retrieve property that was lawfully
seized when those procedures are already publicly available.
525 U.S. at 236, 241.  Instead, the government need only
take "reasonable steps" to inform the owner that property has
been seized.  *Id.* at 240.  When the remedial procedures are
not publicly available, however, reasonable steps must still

---

[13] Defendants do not suggest such extraordinary circumstances
justified the need to destroy the firearms here.

be taken to provide notice of them.  *See Memphis Light*, 436 U.S. at 13–15.

Despite these minor limitations on the notice requirement, no court has held—at least under the circumstances presented here—that notice can be altogether abandoned.  To the contrary, under almost every conceivable scenario, there is "no doubt" that the government must take reasonable steps to provide notice.  *See Mullane*, 339 U.S. at 313.  Given the wealth of precedent—and the safeguards notice provides—the right to notice has been rightfully regarded as "elementary," "fundamental," *Mullane*, 339 U.S. at 314, and "rudimentary," *Kelly*, 397 U.S. at 267. The right cannot reasonably be disputed.

Defendants nonetheless argue that the notice requirement was satisfied at the time the firearms were seized, and Wright was not entitled to any further notice thereafter.  To address the merits of Defendants' argument, we divide up the chronology and nature of the deprivations. Wright was deprived of his property *twice*.  The first occurred when LAPD officers seized his firearms during the execution of a search warrant.  That was a temporary deprivation that is not at issue.

The second deprivation occurred when the LAPD destroyed Wright's property amid ongoing negotiations between Wright and the LAPD.  Key to this claim is that, without notice to Wright, Edwards sought an order from the Los Angeles Court granting permission to destroy Wright's firearms.  Wright alleges that Edwards sought this order while the parties were still informally resolving the ownership dispute, as encouraged by the Ventura Court.  The subsequent destruction of Wright's firearms constituted a permanent deprivation and underscores the need for notice.

We have no problem concluding that a rational trier of fact could find a due process violation under these circumstances. The wealth of precedent suggests that by failing to provide Wright with notice and the opportunity to be heard before the court issued the destruction order, Edwards denied Wright the most basic and fundamental guarantees of due process. *Mullane*, 339 U.S. at 314; *Peralta*, 485 U.S. at 86–87; *Fuentes*, 407 U.S. at 81; *Perkins*, 525 U.S. at 240–41.[14] First, Supreme Court precedent makes clear that ex parte hearings that affect a party's interest in property, without notice, violate due process and any order resulting from such a hearing is void. *Fuentes*, 407 U.S. at 81. Second, Supreme Court precedent makes clear that the purpose of notice is to "apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" *Memphis Light*, 436 U.S. at 14. When an individual, however, is incapable of "ascertaining" the time and place of an impending hearing, *see Perkins*, 525 U.S. at 241, or cannot "reasonably be expected to educate himself about" such a hearing, *see id.* at 242, individualized notice must be provided. Yet here no notice was provided.

Defendants do not dispute the elementary, fundamental, and rudimentary guarantee of the right to notice. Instead, they make three points to argue Wright was not entitled to notice. First, Defendants contend that *Perkins* stands for the proposition that Wright deserved no further notice after the guns were seized, but this reliance is misplaced. As explained above, *Perkins* simply reaffirmed the

---

[14] California's Rules of Court also mandate that a party seeking an ex parte order "must notify all parties" before the appearance, "absent a showing of exceptional circumstances." Cal. Rules of Court, Rule 3.1203(a), https://www.courts.ca.gov/cms/rules/index.cfm?title=th ree&linkid=rule3_1203.

longstanding view that statutes alone can provide sufficient notice of how an owner can retrieve his or her property once it has been seized by the state. 525 U.S. at 241.**15**

*Perkins* does not apply here, where no notice was provided—statutory or otherwise—that the police intended to seek a destruction order *while* Wright's claim of ownership was still pending. If anything, Wright could not have relied on *any* publicly available information to reasonably ascertain that Edwards would seek an ex parte application at the time that he did. *See Memphis Light*, 436 U.S. at 13–15. He thus was entitled to know about that "impending hearing." *See id.*; *see also Gates*, 623 F.3d at 400.

Second, Defendants argue that Wright did have statutory notice because two California statutes required destruction of the firearms. Defendants cite California Penal Code section 34000(a). That provision states that a firearm "shall be . . . destroyed" when "the firearm is an exhibit filed in any criminal action or proceeding which is no longer needed or is unclaimed or abandoned property, which has been in the possession of the officer for at least 180 days . . . ." *Id.* Although the firearms were in LAPD custody for well over

---

**15** Specifically, in that case, police officers seized personal property pursuant to a search warrant. *Perkins*, 525 U.S. at 236. The officers left a form notifying the owners of, among other things, the search, a list of the items seized, and the names of the officers they could contact for additional information. *Id.* at 236–37. Instead of filing a motion for return of their property, the property owners sued the officers under § 1983, arguing they were entitled to notice of the state-law remedies to recover their property. *Id.* at 237–38. The Court disagreed, holding that California law placed the property owners on notice of what remedies were available to them, and the police thus had no obligation to inform individuals of publicly available statutory remedies. *Id.* at 239–41.

180 days, Defendants fail to show the second condition was undisputed—that the firearms were no longer needed as exhibits in criminal action, unclaimed, or abandoned.[16]  To the contrary, Wright had a pending claim of ownership over the firearms and could reasonably have believed that the LAPD was still reviewing his claim.  Defendants also rely on California Penal Code section 18275, but that provision fails to provide Wright with constructive notice.  Section 18275 applies to circumstances in which a firearm is seized at the scene of a domestic violence dispute, not pursuant to a warrant, as here.  *See* Cal. Penal Code § 18250 *et seq.*[17]

---

[16] Defendants' claim that the statute applies "even when the firearms were not filed as exhibits" is unpersuasive.  The case they cite, *People v. Lamonte*, 61 Cal. Rptr. 2d 810, 812 (Ct. App. 1997), stands for no such thing.  There, the government argued that a property claimant was not entitled to the return of property because the statute limited return only to "exhibits," and, because the claimant pled guilty, the evidence had never been filed as exhibits.  *Id.*  The court held: "[W]e see no reason to distinguish between seized property used as exhibits and seized property which was not used. . . . [The claimant] should have no less due process regarding return of property by virtue of pleading guilty rather than proceeding to trial."  *Id.*  That is not a distinction Wright relies on here.  Similarly, little evidence suggests, and a rational trier of fact could certainly conclude otherwise, that Wright "abandoned" the guns, given Wright's counsel's ongoing communications with Defendants and the Ventura Court's September 2011 directive to the parties that they should resolve their disputes informally.

[17] Moreover, § 18275 authorizes the destruction of any firearm held longer than one year, *but* specifically exempts firearms that have not been recovered because of an "extended hearing process" under California Penal Code section 18420.  Section 18420, in turn, allows a person to petition for a second hearing regarding the return of a confiscated firearm if the first hearing is unsuccessful.  Defendants fail to show that Wright would not have been entitled to this exemption.

Last, Defendants assert they did not need to provide Wright notice because he already had his opportunity to pursue available remedies and present his claim of ownership. This argument misses the mark. Wright's claim of ownership was never resolved fully by the Ventura Court. At the September 2011 hearing, the officers stated they needed additional time to review Wright's proof of ownership. Based on this representation, the court deferred ruling on Wright's claims and gave the officers additional time to review Wright's ownership records. The court instructed the parties to attempt to resolve Wright's ownership claim informally, and, if those efforts failed, the parties could return to court. Instead of adhering to these instructions, however, Defendants turned to a different venue altogether—the Los Angeles Court—and sought the ex parte destruction order. By doing so, Defendants pursued a "procedure that deprive[d] [Wright] of [his] claim[] in a random manner." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982).[18]

As the Supreme Court has emphasized time and again, however, an individual is entitled to notice before "any proceeding which is to be accorded finality." *Mullane*, 339 U.S. at 314; *see also Peralta*, 485 U.S. at 86–87;

---

[18] In *Logan*, the Supreme Court held that a state could not skirt its obligation to provide a hearing to a terminated employee on his request for reinstatement by scheduling the hearing outside of the 120-day period mandated by state law. 455 U.S. at 433–35. *Logan* thus stands for the straightforward proposition that a state cannot bypass its due process obligations by creating circumstances that render the process meaningless. That is akin to what Defendants did here: they partially litigated Wright's ownership claims in one adjudicatory proceeding—at the Ventura Court—while depriving him of his due process rights in another—at the Los Angeles Court—all the while pointing to state law to argue that destruction of the firearms was their only choice.

*Fuentes*, 407 U.S. at 81; *Perkins*, 525 U.S. at 240–41.[19] This case confirms why the right to notice and an opportunity to be heard are so fundamental—because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Fuentes*, 407 U.S. at 81 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170–72 (1951) (Frankfurter, J., concurring)).[20] Edwards's ex parte application for permission to destroy Wright's firearms contained statements that a rational trier of fact could find were misrepresentations. For example, Edwards represented to the Los Angeles Court that Wright had provided "[n]o evidence of ownership" and that "[t]he time to appeal has long since passed." But a factfinder could have determined that Wright *did* provide evidence of ownership (i.e., his sworn declaration of ownership), yet Edwards omitted this fact from his application seeking permission to destroy Wright's firearms. Second, a factfinder could have found that the Ventura Court never entered a final appealable order denying Wright's motion for return of his firearms because the October 17, 2011 order only addressed the firearms that the LAPD argued could be released to Wright. That order did not address the disputed firearms. Instead, as Wright explained, the court instructed the parties at the September 2011 court hearing to attempt to resolve their dispute informally and return to court, if necessary.

In sum, Wright does not argue he was entitled to notice beyond what due process mandates, as Defendants assert.

---

[19] The Supreme Court has also recognized that a claimant's failure to comply with a reasonable procedural requirement protects a state from a due process claim. *See Logan*, 455 U.S. at 434 n.7. Such a failure cannot be indisputably assigned to Wright.

[20] To be sure, as explained above, a demonstration of prejudice is not necessary. *See Peralta*, 485 U.S. at 86–87.

Had Wright abandoned the firearms and the requisite time had lapsed under California Penal Code section 34000(a), perhaps the LAPD could have applied ex parte for a destruction order without giving notice of its intended action. *See Logan*, 455 U.S. at 434 n.7. But given that Wright continued to assert a claim of right to the firearms and reasonably believed that the LAPD was still reviewing the documentation he provided, he was entitled to know that the LAPD intended to seek an order permitting destruction of the remaining firearms.

**B.**

Because a reasonable jury could find that Wright was entitled to notice, we must also determine who deprived him of this right. The record clearly shows that Edwards filed the application for an order to destroy the firearms and failed to provide Wright with notice. Thus, taking the facts in the light most favorable to Wright, a reasonable factfinder could conclude that Edwards violated Wright's due process rights.

On the other hand, Wright fails to demonstrate what specific acts Aubry or Tompkins undertook to facilitate Edwards's decision to apply ex parte for a destruction order. Wright points to evidence demonstrating that Aubry and Tompkins opposed releasing the firearms to Wright. He does not, however, cite anything in the record to show that either Aubry or Tompkins instructed Edwards to proceed with the application ex parte or otherwise facilitated the filing of the application. *See Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001). Because there is no evidence linking Aubry or Tompkins to the alleged due process violation— failing to provide notice—we affirm the district court's conclusion that Aubry and Tompkins were entitled to summary judgment.

In sum, taking the evidence in the light most favorable to Wright, a reasonable jury could find that Edwards violated Wright's due process right to notice when he applied for a destruction order without giving Wright notice.

## C.

Next, we must determine whether the right to notice of the ex parte application was "clearly established." *Mattos*, 661 F.3d at 442. A constitutional right is clearly established if the official had "fair notice that her conduct was unlawful" but still engaged in it. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). Usually, we look to binding precedent to determine whether an officer had "fair notice" his or her conduct violated a constitutional right. *Mattos*, 661 F.3d at 442. And, in reviewing our caselaw, we must be careful not to—and have indeed been criticized for—defining clearly-established law "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). As the Supreme Court explained, broad pronouncements of an abstract right usually fail to provide a clear sense of the outer limits of lawful conduct. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). For example, it may be well-established that everyone enjoys "the right to due process," but, as the Court has explained, this constitutional truism falls short in elucidating the "objective legal reasonableness" of an official's action in any given scenario. *Anderson*, 483 U.S. at 639 (quotation marks omitted). Similarly, though in a different context, it is well-known that the Fourth Amendment protects against "unreasonable search[es] or seizure[s]," but that "general proposition . . . is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. Thus, we usually undertake our inquiry "in light of the specific context of the case, not as a broad general

proposition," and determine whether the right, as explicated, carries over to the facts before us. *Brosseau*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201).

At the same time, an official may have "fair notice" that conduct is unlawful, "even without a body of relevant case law," if the violation is so "obvious" that no reasonable official would have engaged in such behavior. *Id.* at 199; *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[I]n [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. . . .") (quotation marks, citation, and alteration omitted); *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.) ("[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing.").

We have thus not hesitated to deny qualify immunity to officials in certain circumstances, "even without a case directly on point." *See, e.g.*, *A.D.*, 712 F.3d at 455; *Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) (denying qualified immunity to officers who unreasonably destroyed property while executing a search warrant); *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir. 2000) (denying qualified immunity to officers who "needlessly ransack[ed] [a] home and destroy[ed] property"); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1138 (9th Cir. 2018) (denying qualified immunity to officers who directed attendees of a political rally toward a violent crowd of protesters).

The need for an on-point case is further diluted when the "clearly established" rule is concrete and specific. For example, in *Mena*, at the time of the allegedly unlawful conduct, it was "clearly established" that officers violate the Fourth Amendment during the execution of a search warrant when they engage in "unnecessarily destructive behavior." 226 F.3d at 1041 (quoting *Liston v. City of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997)). Thus, we concluded that an officer who destroyed an already-ajar door to a home during the execution of a search warrant was not entitled to qualified immunity, even though we did not cite a specific on-point case. *Id.* That is because what conduct constituted needless destruction was, in that instance, self-evident. *See id.*

Similarly, in *Hernandez*, we recognized that our precedent had long established that a person's substantive due process rights were violated when a state actor acted with deliberate indifference to a known or obvious danger but nonetheless exposed an individual to it. 897 F.3d at 1135–37. Although the type of danger to which an officer can expose someone can take innumerable forms, we had no trouble concluding that the nature of the right provided "obvious clarity," in the circumstances there, that shepherding attendees at a political protest through a "violent crowd of protesters and actively prevent[ing] them from reaching safety" violated due process. *Id.* at 1138.

Turning to the case at hand, we have no doubt that Edwards had fair notice that his conduct violated Wright's due process right to notice. Although "due process" has been castigated as "cryptic" and "abstract," *see Mullane*, 339 U.S. at 313, its balustrades have been identified, time and again, as notice and an opportunity to be heard, *id.* at 314; *Peralta*, 485 U.S. at 86–87; *Fuentes*, 407 U.S. at 81;

*Perkins*, 525 U.S. at 240–41. As explained above, California courts have for decades observed this straightforward rule, which adds to our confidence that the law was clearly established. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) ("In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts.") (brackets and internal quotation marks omitted).

Further, unlike the mere general right to "due process," *Anderson*, 483 U.S. at 639, or the abstract right to be free from "excessive force," *al-Kidd*, 563 U.S. at 742, the right to notice is a specific, concrete guarantee that a person will be informed of the government's intent to deprive him or her of property before doing so. *See Mena*, 226 F.3d at 1041. Any reasonable official would have thus known that deviating from this straightforward requirement—and indeed dispensing with it entirely—violates the right to due process.

We are further convinced that the obligation to provide notice was clearly established given that Edwards was seeking ex parte permission to *destroy* the firearms—a permanent kind of deprivation. *See Logan*, 455 U.S. at 433. This makes Edwards's conduct even more egregious than the kind prohibited in *Fuentes*, in which the Court struck down state statutes authorizing the mere *temporary* deprivation of goods through an ex parte writ of replevin. *See* 407 U.S. at 81.

Additionally, we conclude Edwards had fair notice that his conduct violated due process given that he acted in the complete absence of statutory authority. *See Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (denying

qualified immunity to officer who arrested individual without any statutory authority).  As we explained above, no statute authorized Edwards's decision to seek an ex parte application for permission to destroy Wright's property without notifying Wright of his intent to do so.  If anything, the only express rule that applied made it clear that he needed to provide notice.  *See* Cal. Rules of Court, Rule 3.1203(a).

Further, the obviousness of the constitutional violation is especially evident given the Ventura Court's September 2011 instruction to attempt to resolve the dispute informally and to return to court, if necessary.  The record suggests that Edwards knew notice should have been provided; otherwise, he probably would not have told the court that Wright presented no proof of ownership or insinuated that Wright had abandoned his ownership claim.

Thus, although we do not identify a case with the exact factual situation involved here, we conclude that in light of the precedent that did exist at the time Edwards filed an ex parte application for permission to destroy Wright's firearms, his actions fit within the "obvious" situation.  *See Mena*, 226 F.3d at 1041.  It appears obvious to us, even without a case addressing identical facts, that a state actor cannot unilaterally seek to destroy one's property without first providing the individual notice of the intent to do so.  That is the only reasonable inference one can draw in light of *Mullane* and its progeny.  Yet despite knowing that Wright had a pending claim of ownership, Edwards applied to the Los Angeles Court, without notice to Wright, for an order to destroy his property.

We thus conclude that the due process right to notice, as alleged by Wright, was clearly established and, as a result, Edwards is not entitled to qualified immunity.

### D.

Finally, we address the district court's conclusion that City Attorney Feuer and LAPD Chief Officer Beck were entitled to qualified immunity. Wright sued those officials only in their official capacities. Qualified immunity is, however, "available only to government officials sued in their individual capacities" and is "*not* available to those sued only in their official capacities." *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 965 (9th Cir. 2010). We thus reverse the grant of qualified immunity for these defendants.

### III.

Defendants also urge us to affirm on alternative grounds. We reject each argument in turn.

### A.

First, Defendants argue that a § 1983 claim cannot be predicated on a breach of a plea agreement. This argument misconstrues Wright's claims for several reasons. For one, the City was not a party to the agreement, so summary judgment cannot be affirmed in its favor on this ground. Second, Wright is alleging constitutional violations independent of the plea agreement: the plea agreement neither created Wright's possessory interest in the firearms nor is reference to it necessary for the resolution of his constitutional claims.

### B.

We also reject Defendants' contention that they are entitled to "derivative, quasi-judicial immunity" because, once the LAPD seized the contested firearms by warrant,

"the City" acted as a court custodian subject to court orders.**21**   That immunity extends to nonjudicial officers "only if they perform official duties that are functionally comparable to those of judges, i.e., duties that involve the exercise of discretion in resolving disputes." *In re Castillo*, 297 F.3d 940, 948 (9th Cir. 2002).  Defendants fail to show, however, that Edwards performed a duty that was functionally comparable to a judge by keeping custody of Wright's firearms.  Defendants also do not show Edwards performed a functionally comparable duty of a judge when they sought a court order to destroy the property.  This immunity does not apply under this theory.

Nor is Edwards entitled to quasi-judicial immunity because he performed "purely administrative acts." *See id.* at 952.  That immunity applies when a non-judicial officer performs a "non-discretionary or administrative function . . . at the explicit direction of a judicial officer." *Zoretic v. Darge*, 832 F.3d 639, 644 (7th Cir. 2016).  Defendants appear to suggest that they are entitled to immunity under this theory because they complied with a court order to destroy the firearms.  Defendants fail to cite any case, however, that shows that the immunity extends to state actors who *sought and obtained* the order improperly in the first instance.   Also, Edwards exercised discretion in deciding when or whether to seek the order permitting destruction of the firearms.  We thus reject this contention.

---

**21** Defendants do not specify to whom the immunity applies, but rather appear to suggest it applies to all of them.  Defendants, however, provide no authority for the proposition that a municipality or individuals sued in their official capacity can qualify for this kind of immunity.  In any event, we need not resolve this issue because, even assuming the immunity can apply in such circumstances, Defendants fail to show that the immunity applies.

## C.

Defendants also argue that Wright cannot bring a § 1983 claim because he released his property interest in the firearms once he signed the plea agreement. They argue that Wright abandoned his possessory interests because he consented to the LAPD keeping the firearms and deciding whether he was the lawful owner of the firearms. Defendants are wrong for several reasons, but the most important one is they overstate the LAPD's power to decide Wright's ownership claims. The plea agreement did not provide the LAPD with unfettered control over the guns. To be sure, the agreement allowed the LAPD to make an initial ownership decision, but Wright could challenge that determination by filing a motion to compel return of his firearms in a court—which he did. Thus, contrary to Defendants' suggestion, Wright continued to maintain a legitimate possessory interest in the firearms.

Defendants also argue that California Penal Code sections 34000 and 18275 divested Wright of his ownership interest after the one-year period expired. But, for the reasons explained above in Part II.A., this claim fails because neither provision diminished Wright's possessory interests.

## D.

Defendants also argue that a state court order precludes us from deciding whether due process entitled Wright to notice of the ex parte application for a destruction order. Defendants specifically cite the Los Angeles Court's decision in *In re Complaint of Michel & Associates, P.C.*, No. BH011834 (Sept. 18, 2018). We are not persuaded.

"[A] federal court considering whether to apply issue preclusion based on a prior state court judgment must look to state preclusion law." *McInnes v. California*, 943 F.2d 1088, 1092–93 (9th Cir. 1991). In California, "[i]ssue preclusion prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." *DKN Holdings LLC v. Faerber*, 352 P.3d 378, 386 (Cal. 2015) (citation omitted). "[I]ssue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." *Id.* at 387. As for the second requirement, the party seeking to assert issue preclusion must show that each proceeding contained "identical factual allegations." *Lucido v. Superior Court*, 795 P.2d 1223, 1225 (Cal. 1990) (quotation marks omitted).

The factual allegations considered in *Michel & Associates* were not identical to ones presented here, nor were they necessary to the court's final determination. In *Michel & Associates*, a gun-rights group, the California Rifle and Pistol Association, of which Wright is a member, sent a letter to the Los Angeles Court notifying it of what it deemed to be the LAPD's "inappropriate and illegal practice of obtaining invalid court orders relating to LAPD's disposition of seized property." The court issued an Order to Show Cause, asking the parties to brief, among other issues, "[w]hether [the Los Angeles Court] *should adopt a policy* requiring a police agency seeking an order to dispose of property seized under a search warrant where no criminal case has been filed to give notice of the application for the order to likely claimants of the seized property pursuant to [California] Penal Code section 1536." The court ultimately decided that, under *Perkins*, the court need not adopt such a policy.

Wright's claim here, however, addresses a different issue involving different factual allegations. As explained above, Wright alleges a due process violation because he was never given notice of Edwards's intent to apply ex parte for an order permitting destruction of Wright's firearms when he continued to assert an ownership interest in them. What due process demands on these facts is different from the issue decided in *Michel & Associates*, where the court was considering adopting a prospective rule that universally provided notice to all "people or entities likely to claim an interest in the property."

We thus reject this argument.[22]

## IV.

Finally, because we reverse the district court's grant of summary judgment on Wright's Fourteenth Amendment due process claim, we reverse the district court's grant of summary judgment on his failure-to-train claim, which the court characterized as derivative of Wright's due process and Fourth Amendment claims, and remand for further proceedings consistent with this opinion.

## V.

Because a rational trier of fact could find that Wright's due process rights were violated and that Edwards was not entitled to qualified immunity, we reverse the district court's grant of summary judgment on this claim and his *Monell*

---

[22] Because we conclude the issues were not identical, we need not decide whether Wright, as a member of the California Rifle and Pistol Association, was in "privity" with it. *See Rodriguez v. City of San Jose*, 930 F.3d 1123, 1130 (9th Cir. 2019), *pet. for cert. filed*, No. 19-1057 (Feb. 21, 2020).

38                     WRIGHT V. BECK

failure-to-train claim against Beck, Feuer, and the City.  We
affirm the judgment as to Aubry and Tompkins.  We remand
for proceedings consistent with this opinion.[23]

      **AFFIRMED** in part, **REVERSED** in part, and
**REMANDED**.  Appellant shall recover his costs on appeal.

---

[23] In light of Judge Real's passing, we need not address Wright's
request to reassign the case on remand.